

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

**NO. 2-07-167-CV**
**NO. 2-07-168-CV**

UNION SQUARE FEDERAL CREDIT UNION AND DAVID NORRIS

APPELLANTS

V.

RICHARD R. CLAY

APPELLEE

------------

FROM THE 89TH DISTRICT COURT OF WICHITA COUNTY

------------

## MEMORANDUM OPINION[1]

------------

Union Square Federal Credit Union ("Union Square") and David Norris (collectively "Appellants") appeal from two judgments in favor of Appellee Richard R. Clay. In five issues, they argue that the trial court erred by (1) enjoining the enforcement of the underlying money judgments rendered in their

---

[1] *See* Tex. R. App. P. 47.4.

favor, (2) finding that the money judgments were dormant and unrevivable, (3) finding that the abstracts of judgment obtained and the writs of execution issued on the judgments were null and void, (4) finding that Richard never abandoned his homestead claim to his residence at 4600 Trailwood, Wichita Falls, Texas ("Trailwood"), and (5) finding that property at 4409 Tobago Lane, Wichita Falls, Texas ("Tobago") was the separate property or, alternatively, the sole management community property of Richard's wife Diane.  We affirm in part and reverse in part. We affirm those portions of the trial court's judgments declaring that Trailwood is Richard's homestead, but we also reverse the remaining portions of the trial court's judgments, vacate those portions of the trial court's judgments permanently enjoining the enforcement of the underlying money judgments, and render take-nothing judgments against Richard on all of his claims for declaratory relief except his claim that Trailwood is his homestead.

## Background Facts and Procedural History

On July 13, 1989, Union Square filed a lawsuit against Richard, alleging that he had defaulted on a credit agreement.  On March 13, 1990, it filed an amended pleading that incorrectly listed Richard's name as "Richard E. Clay" instead of "Richard R. Clay."  Richard filed an answer and did not object to the change in the pleadings showing his name as "Richard E. Clay."  On July 2,

2

1990, the trial court rendered judgment for Union Square, awarding damages of $24,533.86 plus interest, costs, and attorney's fees.

On August 14, 1990, Union Square asked the clerk to issue a writ of execution on the judgment. The writ identified the judgment debtor as "Richard E. Clay." On November 15, 1990, the sheriff returned the writ nulla bona, that is, the sheriff found no seizable property belonging to Richard E. Clay within the jurisdiction.[2]

On April 4, 2000, a few months short of ten years after the judgment had been rendered, Union Square requested the clerk to issue a second writ of execution. The clerk issued the writ on April 19, 2000, again identifying the judgment debtor as "Richard E. Clay." The writ was received by the Wichita County Sheriff's office on May 2, 2000, and returned nulla bona on May 19, 2000.

On February 16, 2001, Union Square sought a judgment nunc pro tunc to correct the 1990 judgment to identify the judgment debtor as "Richard R. Clay." The trial court rendered the judgment nunc pro tunc on March 5, 2001.

---

[2] *See* Black's Law Dictionary 1098 (8th ed. 2004) (defining "nulla bona" as a notation made by a sheriff on a return when no seizable property belonging to the judgment debtor was found within the jurisdiction).

The clerk issued a writ of execution on the judgment nunc pro tunc and delivered it to the sheriff's office on April 9, 2001.

In an unrelated action, Norris filed suit against Richard on December 22, 1989, alleging that Richard had defaulted on a note of which Norris was the holder. The petition identified the defendant as "Rick Clay." Richard filed an answer but did not appear at trial. Norris obtained a default judgment against Richard on April 3, 1990, with an award of damages of $3,750 plus interest, costs, and attorney's fees. A writ of execution was prepared by the clerk on March 31, 2000, and delivered to the sheriff's office on April 14, 2000, which returned it nulla bona on July 3, 2000. On February 16, 2001, Norris sought a judgment nunc pro tunc to correct the 1990 judgment to identify the judgment debtor as "Richard R. Clay." The trial court rendered the judgment nunc pro tunc. The clerk issued a writ of execution on the judgment nunc pro tunc on April 5, 2001 and delivered it to the sheriff's office on April 9, 2001.

After the writs on the two judgments nunc pro tunc were delivered to the sheriff's office, the sheriff attempted to execute against Trailwood. On June 1, 2001, Richard filed lawsuits against Union Square and Norris seeking declaratory and injunctive relief from the writs of execution on the 1990 money judgments held by them. The trial court heard the cases together. Richard testified that his name was Richard R. Clay but that he also went by "Rick."

4

He further testified that Trailwood was his separate property and homestead, that he kept no bank accounts and paid all his bills with cash, that Tobago was his wife's separate property, and that he would not have been able to finance its purchase himself. He also testified that he had no ownership interest in five other properties held in his wife's name.

On April 18, 2007, the trial court rendered judgment granting the relief sought by Richard, finding that Richard never abandoned his homestead claim to Trailwood and declaring that Trailwood is Richard's homestead, that Tobago is the separate property or, alternatively, the sole management community property of Richard's wife Diane, and that the 1990 money judgments obtained by Appellants are dormant and cannot be revived. The trial court further ordered that Appellants "may not take any action in the future to attempt to collect or revive" the money judgments. Appellants appealed.

**Analysis**

*Dormancy of the Judgments*

In Appellants' second issue, they argue that the trial court erred by finding that the money judgments rendered in their favor were dormant and unrevivable. In Appellants' third issue, they argue that the trial court erred by finding that the abstracts of judgment obtained and the writs of execution issued by Appellants on the money judgments were null and void. In their first

5

issue, Appellants contend that the trial court erred by enjoining the enforcement of the money judgments. Appellants combine their arguments on these issues, and we will address them together.

A judgment becomes dormant if no writ of execution is issued within ten years after its rendition.[3] If a writ is timely issued, another writ of execution must be issued at some time within ten years after the prior writ or the judgment will become dormant.[4] If the judgment becomes dormant, no writ of execution may be issued until the judgment has been revived by scire facias or by an action of debt.[5] An action to revive a dormant judgment may not be brought after the second anniversary of the date that the judgment became dormant.[6]

In the trial court, Richard contended that the writs on the 1990 Union Square judgment were not properly issued because the 1990 writ of execution was defective in that his middle initial was not properly placed in the execution and that no execution issued in 2000 because Union Square instructed the sheriff to return the writ nulla bona. He argued that no writ of execution issued

---

[3] Tex. Civ. Prac. & Rem. Code Ann. § 34.001(a) (Vernon 2008).

[4] *Id.* § 34.001(b).

[5] *Id.* §§ 31.006, 34.001(a).

[6] *Id.* § 31.006.

on the 1990 Norris judgment because the original writ that was issued stated the name of the judgment debtor as "Rick Clay" and because it was not timely delivered to the sheriff.

If the writs of execution issued by Appellants were null and void as alleged by Richard, then no writs were issued within ten years of rendition of the money judgments, the judgments became dormant and unrevivable, and the trial court did not err by enjoining their enforcement.[7] Appellants had the burden at trial to prove issuance of a valid writ within the statutory period.[8]

We first address the writs of execution originally issued on the underlying money judgments and whether they were fatally defective. Appellants argue that the minor irregularities in the form of the writs were immaterial. We agree.

Rule 629 of the rules of civil procedure provides that a writ of execution must contain the name of the party against whom judgment was rendered.[9] Not every element set out in rule 629 is vital for the creation of a valid writ.[10] But a writ is of no effect if it completely omits the name of the judgment debtor

---

[7] *See id.* §§ 31.006, 34.001(a).

[8] *See Ross v. Am. Radiator & Standard Sanitary Corp.*, 507 S.W.2d 806, 809–10 (Tex. Civ. App.—Dallas 1974, writ ref'd n.r.e.).

[9] Tex. R. Civ. P. 629.

[10] *Collins v. Hines*, 100 Tex. 304, 99 S.W. 400, 402 (1907).

7

or misidentifies the party against whom judgment was rendered.[11]  Richard argued that under this requirement, a writ of execution identifying him as "Richard E. Clay" or "Rick Clay" is void.  Although we have found cases holding that a writ was void for failing to reflect the name of the debtor as it appeared in the judgment, we have found no case voiding a writ of execution on the ground that, although it reflected the name of the defendant as it appeared in the judgment, it failed to state correctly the defendant's legal name.  Furthermore, courts have allowed some deviation from the requirements for writs.[12]

---

[11]▲ *Id.* (stating that it is "essential" that writ of execution state "against whom it is to operate" because "[w]ithout the command to take the property of a named person, the official has no authority to take that of any one"); *Battle v. Guedry*, 58 Tex. 111, 1882 WL 9585, at *2–3 (1882) (holding that judgment against J. P. Clements would not support writ of execution reciting judgment against P. B. Clements when evidence did not show the two judgments were one and the same).

[12]▲ *See Houston Oil Co. of Tex. v. Randolph*, 251 S.W. 794, 797 (Tex. Comm'n App. 1923, judgm't adopted) (noting that "where there exists a valid judgment, a writ of execution[,] though defective and irregular in failing to comply with some of the statutory requirements with reference to the form of the writ, is only voidable" and citing to cases upholding writs that failed to comply with some of the statutory requirements for the form of the writ); *see also Irvin v. Ferguson*, 83 Tex. 491, 18 S.W. 820, 821 (1892) (addressing writ that described trial court judgment rather than supreme court judgment and omitted name of plaintiffs and holding that "[w]e are not prepared to hold that any of the irregularities referred to would, under the execution and sale, render it void").

We believe that the doctrine of misnomer applies to this case. Misnomer is when the plaintiff sues but misnames the correct defendant.[13] Under Texas law, a judgment is not rendered void by the misnaming of a defendant, "provided the intention to sue the correct defendant is evident from the pleadings and process, such that the defendant could not have been misled."[14] If the defendant appears and does not object to the misnomer, the judgment is binding on him as though he had been properly named.[15]

In this case, Richard acknowledged that he filed an answer in Union Square's suit. And although he signed his pleadings with his correct initial and stated in interrogatories that his legal name was Richard Robert Clay, he did not object that he had been misnamed. The suit in that case was on a promissory note that Richard admitted he had executed. Union Square's intention to sue Richard was obvious from the pleadings and process, and Richard was clearly

---

[13] *Enserch Corp. v. Parker*, 794 S.W.2d 2, 4 (Tex. 1990); *Torres v. Johnson*, 91 S.W.3d 905, 908 (Tex. App.—Fort Worth 2002, no pet.).

[14] *Brown v. Lanier Worldwide, Inc.*, 124 S.W.3d 883, 895 (Tex. App.—Houston [14th Dist.] 2004, no pet.); *see also Abilene Indep. Tel. & Tel. Co. v. Williams*, 111 Tex. 102, 229 S.W. 847, 848 (1921) (stating that misnomer that is not misleading "merely entitles the defendant to abate the proceeding until the misnomer be corrected").

[15] *Abilene*, 229 S.W. at 848; *see also Brown*, 124 S.W.3d at 895.

not misled by the misnomer.[16]  We also note that he did not file a plea in abatement to correct the mistake or attack the money judgment on appeal.[17]

Similarly, although the judgment obtained by Norris was against "Rick Clay," Richard was served and filed an answer in that case.  Richard admitted at trial that he goes by the name "Rick Clay," and he stated in interrogatories in Norris's suit against him that his name was "Richard Robert Clay, a/k/a/ Rick Clay."  He did not object that he had been misnamed, and he admitted in the declaratory judgment trial that he had executed the note on which Norris sued. Norris's intention to sue Richard was clear from the pleadings and process, and Richard was not misled by the misnomer.  Thus, the 1990 money judgments obtained against Richard by Appellants were valid judgments.[18]

Because a writ of execution on these judgments had to conform to the defendant as named in the judgments,[19] and the judgments were valid despite

---

[16] *See Brown*, 124 S.W.3d at 897 (noting that defendant was not misled by the misnomer in that case).

[17] *Abilene*, 229 S.W. at 848 (noting that the misnomer of a defendant "merely entitles the defendant to abate the proceeding until the misnomer be corrected").

[18] *See Brown*, 124 S.W.3d at 895.

[19] *See* Tex. R. Civ. P. 629; *Battle*, 1882 WL 9585, at *2–3.

the misnomers,[20] it stands to reason that the writs of execution issued on those judgments must also have been valid despite the misnomers. We find applicable the reasoning applied by the Supreme Court of Texas in *Abilene Independent Telephone and Telegraph Co. v. Williams*.[21] In that case, the court decided whether a defendant may enjoin the enforcement of a default judgment when the defendant is misnamed in the petition, citation, and judgment. An employee sued his employer, Abilene Independent Telephone & Telegraph Company, for injuries sustained on the job.[22] His petition misnamed his employer as Abilene Independent Telephone Company.[23] The citation issued named the defendant as Abilene Telephone Company. The citation was returned as served on Abilene Independent Telephone Company.[24] An attorney for Abilene Independent Telephone & Telegraph Company declined to appear on behalf of the company but, as a friend of the court, exhibited a charter showing the company's correct name.[25] The trial court rendered a default

---

[20] *See Abilene*, 229 S.W. at 848.

[21] *Id.* at 849.

[22] *Id.* at 847.

[23] *Id.*

[24] *Id.* at 848.

[25] *Id.*

11

judgment for the employee, and execution was ordered to issue against Abilene Independent Telephone Company. Thus, neither the petition, citation, judgment, or writ of execution correctly named the company, but there was no doubt as to the true identity of the party being sued.[26] The company then brought suit to enjoin the execution.[27] Although the ground presented by the company for the injunction was that no judgment had been rendered against it by its true corporate name, and not that the writ of execution did not correctly name it, the court's analysis is instructive to the case here.

The court first noted that under the facts of the case, where the true identity of the defendant was not in question, the defendant was obliged to appear and answer or face default judgment.[28] The court stated that if a party knows that suit has been brought against it but fails to appear and object to the mistake in its name, "it ought to be treated as having waived the mistake."[29] Thus, under the court's holding, because Richard did not object in the trial court

---

[26] *Id.* at 847–48.

[27] *Id.* at 847.

[28] *Id.* at 848.

[29] *Id.*

that he had been misidentified when Appellants originally sued him, we must treat him as having waived the mistake in his name.[30]

The court also noted that the judgment was being attacked, not on direct appeal, but collaterally in an injunction action. It stated that "[n]umberless errors entitle a party to a reversal of a judgment on appeal [but] are of no avail when relied on to support a collateral attack on the judgment or *to furnish a basis for equitable relief against the enforcement of the judgment*."[31] The court went on to state that the judgment was not void and that "[u]nder thoroughly settled principles, equitable relief against the enforcement of the judgment must be denied."[32] Although the supreme court decided *Abilene* over eighty years ago, the holding in that case has not been overruled.

The principles set out in *Abilene* apply here. Like the judgment debtor in *Abilene*, Richard made a collateral attack on the judgments and sought equitable relief from them in the form of an injunction.[33] As in *Abilene*, there is no doubt that Richard was the defendant in both judgments. Although he stated his

---

[30] *See id.*

[31] *Id.* at 848 (emphasis added).

[32] *Id.* at 849.

[33] *See In re City of Dallas*, 977 S.W.2d 798, 804 (Tex. App.—Fort Worth 1998, no pet.) (noting that injunction is equitable relief).

13

correct name in both cases in responses to interrogatories, he never objected

to the misnomer in either case. Thus, he should be treated as having waived

the mistake, and he cannot now argue that the enforcement of the judgments

should be enjoined based on the mistake.[34] And although he states his ground

for relief as a misidentification in the writs of execution rather than in the

judgments, the same reasoning should apply.[35] We note that Richard did not

object in the trial court when the money judgments were rendered,[36] did not ask

for post-trial correction of the judgments to reflect his legal name,[37] and did not

attack the previous writs for failing to use his legal name.[38] Instead, he waited

---

[34] *Abilene*, 229 S.W. at 848–49.

[35] *See Williams v. Ball*, 52 Tex. 603, 1879 WL 7761, at *5 (1879) (citing Freeman on Executions for the proposition that "[w]hen an execution is not in proper form . . . the defendant . . . ought not to be heard when . . . he has allowed plaintiff to be placed in a worse situation than though prompt complaint had been made" and that "[w]hen sufficient [sic] appeared on the face of the execution to connect it with the judgment, courts have frequently disregarded variances in the names of the parties").

[36] *See Abilene*, 229 S.W. at 848.

[37] *See Carlyle Real Estate Ltd. P'ship-X v. Leibman*, 782 S.W.2d 230, 233 (Tex. App.—Houston [1st Dist.] 1989, no writ) (holding that trial court did not err by rendering judgment nunc pro tunc to accurately reflect legal name of party against whom judgment was rendered).

[38] *See Ayres v. Duprey*, 27 Tex. 593, 1864 WL 2724, at *9 (1864) (noting that law was "abundantly settled . . . that the question of irregularity or error in the execution, or the proceeding under it by the sheriff, can never be discussed collaterally in another suit").

14

to attack the writs until the time when the judgments would be dormant if no writ of execution had issued on them.  Because Richard allowed Appellants to be placed in a worse situation than if he had made a prompt complaint, he should not be heard to complain now.[39]

Furthermore, in Union Square's suit, it named Richard using a correct Christian name but an incorrect middle initial.  Under the common law, a middle initial was held to be of no importance.[40]  Although cases have suggested that the common law may no longer be applicable,[41] we have found no case

---

[39] *See Williams*, 1879 WL 7761, at *5.

[40] *See Mullins v. Albertson*, 136 S.W.2d 263, 264 (Tex. Civ. App.—San Antonio 1940, writ ref'd) (noting that judgment at issue named defendant as G. W. Albertson, that abstract of judgment also named the defendant as G. W. Albertson, and that there was no question that G. M. Albertson and G. W. Albertson were one and the same person and holding that the abstract of judgment naming G. W. Albertson created a lien against land belonging to G. M. Albertson); *Gilles v. Miners' Bank of Cartersville, Mo.*, 198 S.W. 170, 171 (Tex. Civ. App.—Amarillo 1917, writ ref'd) (op. on reh'g) (stating that under common law middle initials "were never taken notice of" and that it was of no concern whether that rule still applied when question was raised for first time on appeal because "a misnomer can be taken advantage of only by plea in abatement").

[41] *See Wicker v. Jenkins*, 49 Tex. Civ. App. 366, 108 S.W. 188, 190 (Tex. Civ. App.—Texarkana 1908, no writ) (noting that common law rule disregarding middle initial, or middle name, of a party to an instrument had "lost much of the reason upon which it was originally based" and holding that abstract of judgment identifying plaintiff as W. "B. F." Wicker instead of W. "F. B." Wicker did not create a lien on the defendant's property).  *But see Gilles*, 198 S.W. at 171.

15

expressly abrogating it.[42] With respect to Norris's suit, the name "Rick" is a common diminutive of "Richard."[43] A common diminutive of a name is sufficient to identify a person,[44] and here, not only is Rick a common diminutive of Richard, but the Richard involved in this suit is known by that name and has entered into at least one agreement using it. Thus, under the facts presented here, neither the incorrect middle initial nor the use of a diminutive made the writs void.

While this court declines to create a general rule as to when a writ that misnames the judgment debtor is nonetheless valid and enforceable, we hold that in this limited factual situation—when there was no doubt as to the true

---

[42] *See Mullins*, 136 S.W.2d at 264 (holding that abstract of judgment naming G. W. Albertson created a lien against land belonging to G. M. Albertson).

[43] *See, e.g.*, *U.S. v. Vallee*, No. 08-01987-CR, 2008 WL 5411079, at *1 (2d Cir. Dec. 30, 2008) (styling the case "United States of America v. Richard Vallee, also known as 'Rick'"); *U.S. v. Clonce*, 186 Fed. Appx. 464, 2006 WL 1738221, at *1 (5th Cir. 2006) (naming defendant as "Richard Lee Clonce, also known as Rick Clonce"); *Szkatulski v. Thruway Inn, Inc.*, 836 N.Y.S.2d 463, 463 (N.Y. App. Div. 2007) (naming one respondent as "Richard Osborne, also known as Rick Osborne").

[44] *O'Brien v. Cole*, 532 S.W.2d 151, 152–53 (Tex. Civ. App.—Dallas 1976, no writ) (noting that "purpose of describing a person by name is to identify him" and that "[a] commonly-known diminutive or abbreviation is sufficient to identify a person in the absence of evidence indicating that a different person is intended" and holding that use of the name "Terry" in an invoice was sufficient to identify "Terrance" as alleged in petition).

16

identity of the party, the party failed to object at trial or to the judgments nunc pro tunc to correct the misnomer, and where the misnomers are merely the use of an incorrect middle initial and the use of a diminutive by which the party acknowledged he is known—the writs were valid. The trial court therefore erred by declaring that the writs of execution were null and void.

Richard argued in the trial court that even if the 1990 writ issued on Union Square's money judgment was valid, the judgment nonetheless became dormant because in 2000, when another writ of execution was required to maintain the judgment, Union Square instructed the sheriff to return the writ "nulla bona" and therefore no writ was issued. On April 4, 2000, Union Square's attorney sent a letter to the district clerk stating, "Please issue a Writ of Execution and advise the Sheriff that he may return it Nulla Bona in 30 days." Rule 629 states that a writ "shall require the officer to return it within thirty, sixty, or ninety days, as directed by the plaintiff or his attorney."[45] Union Square directed the sheriff that if after thirty days, no property could be found to levy upon, the sheriff could return it nulla bona at that time. Union Square did not instruct the sheriff not to attempt to levy on Richard's property;[46] it merely instructed the sheriff to return the writ after thirty days,

---

[45] Tex. R. Civ. P. 629.

[46] *See Carpenter v. Probst*, 247 S.W.2d 460, 461 (Tex. Civ. App.—San

17

rather than continue to look for property for sixty or ninety days. Richard argued in the trial court that because of the instruction to the sheriff, the sheriff did not attempt to serve the writ. There was no evidence about the motivation of the sheriff in not serving the writ on Richard; although Richard testified that no one attempted to serve the writ on him, he also testified that no one attempted to serve the 1990 writ either. The writ as prepared by the clerk instructs the sheriff to return the writ in thirty days and does not instruct him to hold it and to return it nulla bona without attempting to levy on Richard's property. There was no evidence that the sheriff ever saw the letter from the attorney. Further, the sheriff's return stated that it was returned nulla bona, "[n]o property found in Wichita County belonging to Defendant subject to Execution." Thus, on the face of the return, the sheriff did look for Richard's property. We reject Richard's argument that Union Square's attorney's letter to the clerk prevented the writ from issuing. Thus, we hold that the writ of execution was validly issued and served to keep Union Square's money judgment from becoming dormant, and the trial court erred by declaring that the

Antonio 1952, writ ref'd) (holding that when no showing was made that officer "was in any way thwarted or deterred from performing his duty," writ issued when delivered to officer); *cf. Harrison v. Orr*, 296 S.W. 871, 875–76 (Tex. Comm'n App. 1927, judgm't adopted) (holding no "issuance" of writ when, upon clerical preparation of the writ, sheriff was instructed to hold the writ until a certain date and then return it).

judgment was dormant and that the abstracts of judgment against Richard based on the judgment were null and void.

Richard also argued that the writ of execution on the money judgment obtained by Norris was not issued within the ten-year time period of section 34.001 and thus the judgment became dormant because, although the clerk prepared the writ before the ten-year time period had run, the writ was not delivered to the sheriff for enforcement until after the time period had run. On appeal, Appellants argued that the issuance of the 2000 writ on Norris's judgment was timely, given that only fourteen days elapsed between the clerk's preparation of the writ and delivery to the sheriff for enforcement.

Although section 31.004 does not define "issue," courts have long held that issuance of a writ requires more than preparation of the writ by the clerk—the writ must also be delivered to an officer for enforcement.[47] In determining the effect of preparation of the writ before the statutory period but delivery after the statutory period, some courts have relied on the law governing statutes of limitations and service of citation.[48] If a suit is filed before the end of the limitations period but the defendant is not served until

---

[47] *Parlin & Orendorff Implement Co. v. Chadwick*, 4 S.W.2d 133, 135 (Tex. Civ. App.—Fort Worth 1928, no writ).

[48] *Ross*, 507 S.W.2d at 809–10; *Williams v. Short*, 730 S.W.2d 98, 99–100 (Tex. App.—Houston [14th Dist.] 1987, writ ref'd n.r.e.).

19

after the limitations period has run, and the defendant asserts the defense of limitations, the plaintiff must show that he exercised reasonable diligence in having the defendant served.[49] The relevant inquiry in assessing the plaintiff's diligence is "whether the plaintiff acted as an ordinarily prudent person would have acted under the same or similar circumstances and was diligent up until the time the defendant was served."[50] If diligence is shown, then the date of service relates back to the date the petition was filed.[51] Relying on that body of law, some courts have held that if a writ of execution is clerically prepared before the ten years in section 34.001 ends but not delivered to an officer for enforcement until after the period ends, the judgment creditor must show reasonable diligence in having the writ delivered to the sheriff.[52]

In this case, the money judgment obtained by Norris was signed on April 3, 1990. The writ was clerically prepared by the clerk on Friday, March 31, 2000—within the statutory period—and delivered to the sheriff on Friday, April

---

[49] *Ross*, 507 S.W.2d at 809.

[50] *Proulx v. Wells*, 235 S.W.3d 213, 216 (Tex. 2007).

[51] *See Tarrant County v. Vandigriff*, 71 S.W.3d 921, 924 (Tex. App.—Fort Worth 2002, pet. denied).

[52] *See Rollins v. Am. Express Travel Related Servs. Co.*, 219 S.W.3d 1, 4 (Tex. App.—Houston [1st Dist.] 2006, no pet.); *Williams*, 730 S.W.2d at 100; *Ross*, 507 S.W.2d at 809.

14, 2000—outside the statutory period.  Norris offered no explanation in the record for the delay in delivery of the writ to the sheriff.

With respect to service of citation, some courts (including this one) have held that when no explanation for the delay is given, the delay shows a lack of diligence as a matter of law.[53]  Such cases generally involve a delay of months or years.[54]  But two courts have held that "a showing of *speedy* service of citation, without any unexplained lapses of time, may establish diligence as a matter of law."[55]  In *Harrell*, the El Paso Court of Appeals held that the plaintiff did not have to show evidence of diligence in serving the defendants after the statute of limitations had passed because a clerk "must be given a reasonable time to fulfill her obligations" to issue and deliver citations, and "a party may ordinarily rely on the clerk to perform that duty within a reasonable time."[56]

---

[53] *See Vandigriff*, 71 S.W.3d at 925 ("Whether a plaintiff was diligent in effecting service is normally a question of fact, but if no excuse is offered for a delay . . . lack of diligence will be found as a matter of law.").

[54] *See, e.g.*, *Gant v. DeLeon*, 786 S.W.2d 259, 260 (Tex. 1990) (delay of three periods totaling thirty-eight months); *Vandigriff*, 71 S.W.3d at 926 (twenty-eight-month delay); *Ross*, 507 S.W.2d at 809–10 (delay of over two months).

[55] *Harrell v. Alvarez*, 46 S.W.3d 483, 486 (Tex. App.—El Paso 2001, no pet.) (holding that three weeks is not an unreasonable amount of time to allow a clerk to perform her duties) (emphasis added).

[56] *Id.*

The three weeks it took the clerk to issue and serve citation "did not entail any inaction by the clerk obligating . . . recognition and correction" by the plaintiff in the case and therefore that period of time did not "include any unexplained lapses in diligence."[57] The Dallas Court of Appeals similarly has held that two weeks was a reasonable amount of time to allow the clerk to perform his duties and that the plaintiff was not required to do anything within that time to ensure that the clerk delivered the citations.[58]

Here, we have a delay of two weeks. We find compelling the reasoning of the El Paso and Dallas Courts of Appeals and hold that it should apply to the issuance of writs of execution. The record is not clear whether, after preparing the writ, the clerk delivered it to the sheriff or Norris's attorney.[59] But even assuming the clerk delivered the writ to Norris's attorney, rather than delivering the writ directly to the sheriff for enforcement, some time must be allowed for the clerk to notify Norris's attorney that the writ has been prepared, for Norris's

---

[57] *Id.*

[58] *Boyattia v. Hinojosa*, 18 S.W.3d 729, 734 (Tex. App.—Dallas 2000, pet. denied) ("Two weeks is not an unreasonable amount of time to allow a clerk to perform his duties under the rule. Accordingly, there was no inaction by the clerk that Boyattia was obligated to recognize and act upon to correct.").

[59] *See Bourn v. Robinson*, 107 S.W. 873, 875 (Tex. Civ. App.—Texarkana 1908, no writ) (noting that law did not require clerk to deliver writ to officer for enforcement and that clerk may have delivered writ into hands of plaintiff or his attorney).

attorney to go to the clerk's office and pick up the writ or for the clerk to deliver the writ to Norris's attorney, and for Norris's attorney to deliver the writ to the sheriff. We decline to set out a general rule for how long a clerk must be allowed to prepare a writ, or how much time after preparation of a writ must be allowed to deliver it to an officer for enforcement, but we hold that two weeks shows reasonable diligence. Thus, Norris was not required to give any explanation in the trial court for the delay, and the date of delivery relates back to the date of preparation of the writ.[60] We hold that the writ of execution on Norris's 1990 money judgment was therefore timely issued and prevented the judgment from becoming dormant, and, consequently, the trial court erred by declaring that the Norris judgment became dormant and that any abstract of judgment based on the judgment was null and void.

Having held that the 1990 money judgments did not become dormant, we now consider whether the trial court had the authority to change Richard's name on the judgments by judgment nunc pro tunc. Richard argued to the trial court in his declaratory judgment action that the judgments nunc pro tunc changed the defendant and therefore constituted a correction of a judicial error and not a clerical error. The trial court's judgments on Richard's declaratory

---

[60] *See Harrell*, 46 S.W.3d at 486.

judgment actions made no finding about whether Richard's name could validly be corrected in a judgment nunc pro tunc and said only that the judgments nunc pro tunc were invalid because they were rendered when the underlying money judgments were dormant. We have held that the underlying money judgments were not dormant. Furthermore, there is no question that Richard was the correct defendant in both of the underlying suits. The types of misnomers at issue here constitute clerical errors that may be corrected by judgment nunc pro tunc.[61] Thus, the trial court properly entered the judgments nunc pro tunc.[62] And, accordingly, the writs of execution issued on those judgments were valid. Because we hold that the trial court erred by declaring that the money judgments against Richard were dormant and incapable of being revived, we

---

[61] *See Masterson v. Young*, 48 S.W. 1109, 1110 (Tex. Civ. App.—Austin 1899, writ ref'd) (noting that a mistake as to a person's middle initial "does not, ordinarily, affect the rights of the parties"); *see also Kollman Stone Indus., Inc. v. Keller*, 574 S.W.2d 249, 250 n.2 (Tex. Civ. App.—Beaumont 1978, no writ) (noting that courts have held that "entry of a nunc pro tunc judgment is a proper method of correcting an error in the initials of the defendant"); *Goodyear Tire & Rubber Co. v. Pearcy*, 80 S.W.2d 1096, 1097 (Tex. Civ. App.—Eastland 1935, no writ) (stating that it was "evident" that the entry of judgment against R. A. Pearcy instead of A. R. Pearcy was clerical error and not judicial error).

[62] *See Kollman Stone*, 574 S.W.2d at 250 n.2; *see also Daniels v. Comm'n for Lawyer Discipline*, 142 S.W.3d 565, 573 (Tex. App.—Texarkana 2004, no pet.) (reciting rule that a nunc pro tunc judgment relates back to the date of original judgment); *Gen. Elec. Co. v. Canyon City Ice & Light Co.*, 136 S.W. 78, 79 (Tex. Civ. App.—Fort Worth 1911, no writ) (same).

sustain Appellants' second issue.  Because the judgments were not dormant, we further hold that the trial court abused its discretion by enjoining the enforcement of the judgments.[63]  Accordingly, we sustain Appellants' first issue.  Because we hold that the abstracts of judgment and writs of execution issued by Appellants were valid, we sustain Appellants' third issue.

*Homestead Claim to Trailwood*

In Appellants' fourth issue, they argue that the trial court erred by finding that Richard never abandoned his homestead claim to Trailwood.[64]  Appellants do not specify whether they challenge the trial court's finding for legal sufficiency or for factual sufficiency, but because they ask this court to render judgment on the issue, we will review the finding for legal sufficiency.[65]  We therefore determine whether Appellants established as a matter of law that

---

[63] *Jamestown Partners, L.P. v. City of Fort Worth*, 83 S.W.3d 376, 384 (Tex. App.—Fort Worth 2002, pet. denied) (stating that permanent injunctions are reviewed for clear abuse of discretion).

[64] *See BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794–95 (Tex. 2002) (stating that in appeal from trial to the court, appellant may challenge trial court's findings for legal and factual sufficiency of the evidence).

[65] *See Glover v. Tex. Gen. Indem. Co.*, 619 S.W.2d 400, 401–02 (Tex. 1981) (stating that if appellate court sustains challenge to factual sufficiency, it must reverse judgment and remand for new trial).

Richard abandoned Trailwood as his homestead.[66] Appellants concede that Richard proved that Trailwood had been his homestead at one time, but they argue that Richard abandoned his homestead rights in the property.

Once a party proves the existence of homestead rights in property, those rights are presumed to continue until abandoned or until a new homestead is acquired.[67] A party asserting abandonment of a homestead has the burden of proving it.[68] Thus, once Richard established that Trailwood was his homestead, Appellants had to prove that Richard had abandoned that property as his homestead.

To show abandonment of a homestead, a party must prove cessation of use of the property as a homestead coupled with an intention not to return.[69] A person may not have two homesteads, and the establishment of a new

---

[66] *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001) (stating that party attacking legal sufficiency of adverse finding on issue on which party had burden of proof must demonstrate on appeal that evidence establishes, as a matter of law, all vital facts in support of issue).

[67] *Sullivan v. Barnett*, 471 S.W.2d 39, 43 (Tex. 1971); *Rancho Oil Co. v. Powell*, 142 Tex. 63, 175 S.W.2d 960, 963 (1943).

[68] *Caulley v. Caulley*, 806 S.W.2d 795, 797 (Tex. 1991); *Sullivan*, 471 S.W.2d at 43.

[69] *Rancho Oil Co.*, 175 S.W.2d at 963; *see also Hudgins v. Thompson*, 109 Tex. 433, 211 S.W. 586, 587 (1919).

26

homestead constitutes abandonment of the previous homestead.[70] But merely acquiring and moving to a new "home" does not necessarily establish the acquisition of a new "homestead."[71] The evidence demonstrating abandonment "must be undeniably clear and beyond almost the shadow, at least of all reasonable ground of dispute, that there has been a total abandonment with an intention not to return and claim the exemption."[72]

Appellants contend that the evidence supported the conclusion that Richard and his family moved to Tobago with the intent to "trade up" their home and that Richard only "remembered" his intent to return to Trailwood when it became clear he could lose the property to his creditors. They further contend that Richard's testimony that he intended to return to Trailwood was insufficient because he did not testify when he would return or what circumstances would lead him to return. Appellants cite no law for the proposition that Richard was required to put on evidence of any definite plan

---

[70] *Silvers v. Welch*, 127 Tex. 58, 91 S.W.2d 686, 687–88 (1936).

[71] *Rancho Oil Co.*, 175 S.W.2d at 963 ("The acquiring of a new home is not always the acquiring of a new homestead, and one does not necessarily abandon a homestead by merely moving his home."); *see also Silvers*, 91 S.W.2d at 688.

[72] *Rancho Oil Co.*, 175 S.W.2d at 963; *Burkhardt v. Lieberman*, 138 Tex. 409, 159 S.W.2d 847, 852 (1942) (citing *Gouhenant v. Cockrell*, 20 Tex. 96, 1857 WL 5186, at *2 (1857)).

to return to the property to defeat an assertion of abandonment.[73] Richard did not have to put on evidence of any kind that he intended to return to the property; rather, Appellants had to prove that he discontinued use of Trailwood with the intent to permanently do so.[74]

As evidence that Richard abandoned his homestead at Trailwood, Appellants note that in 2001, Richard and his wife bought another home (Tobago) and that they had not lived at Trailwood for four years.[75] Appellants also point out that the county taxing authority terminated Richard's homestead property tax exemption on Trailwood after he failed to spend a night on the property during 2003, and they argue that Richard's failure to take any action

---

[73] *See, e.g.*, *Foreman v. Meroney*, 62 Tex. 723, 1884 WL 8988, at *4 (1884) ("[A]bandonment is accomplished, not by going away without any intention of returning at any particular time in the future, but by going away with the definite intention never to return at all.").

[74] *See Caulley*, 806 S.W.2d at 797 (stating that "anyone asserting abandonment has the burden of proving it by competent evidence"); *Archibald v. Jacobs*, 69 Tex. 248, 6 S.W. 177, 251 (1887) ("Abandonment of property actually homestead cannot be accomplished by mere intention. There must be a discontinuance of the use, coupled with an intention not again to use as a home."); *see also Gill v. Quinn*, 613 S.W.2d 324, 327 (Tex. Civ. App.—Eastland 1981, no writ) (noting that "[a]bandonment requires both the overt act of discontinued use and intent to permanently do so" and that "burden of proving both act and intention to abandon property as homestead rests on the person seeking to subject it to forced sale").

[75] *See Hudgins*, 211 S.W. at 588 (noting that "the best evidence of homestead abandonment" is proof that "a new and permanent home had been acquired").

28

to reinstate the exemption indicates in a clear manner his intent not to return to the property. The Clays both acknowledged that they had not spent a night on the property since moving to Tobago. Diane testified that her driver's license lists the Tobago address.[76] In addition, Appellants introduced a deed of trust that the Clays had executed on Trailwood as part of the transaction for the loan they obtained to purchase the house on Tobago, and if Trailwood was their homestead, then the Clays obtained a loan from a bank in part by signing a void deed of trust.[77] The president of the bank through which the Clays financed the purchase of Tobago testified that it was his understanding that the Clays purchased Tobago to be their homestead, although he also testified that he understood that Diane was purchasing Tobago as her separate property and

---

[76] *See, e.g.*, *Barrera v. State*, No. 14-04-01030-CR, 2005 WL 1691037, at *5 (Tex. App.—Houston [14th Dist.] July 21, 2005, no pet.) (mem. op.) (including the fact that appellants used McAllen address on driver's licenses in list of evidence that they had established new homestead in McAllen, thereby abandoning Houston homestead).

[77] *See Hinton v. Uvalde Paving Co.*, 77 S.W.2d 733, 736 (Tex. Civ. App.—Dallas 1934, writ ref'd) (stating that if parties did not intend to abandon their former home as a homestead, "the continuity of this intention" was broken by their mortgage of the property to secure a loan, "for it will not be assumed that they would be parties to the void, illegal, and futile act of mortgaging their home-stead"); *see also* Tex. Const. art. 16, § 50 (limiting the validity of a lien created on homestead property to certain specific transactions, which do not include the financing of a second home).

that no one told him that she was abandoning her homestead at Trailwood when she did so.

Evidence in support of the trial court's finding included the testimony of both Diane and Richard that they considered Trailwood to be their homestead. Diane testified that the utilities are still connected to Trailwood, they still maintain the property, and they still have furniture at the property. The Clays have not rented[78] or sold[79] Trailwood, and they have not claimed any other property as their homestead. Thus, there was evidence before the trial court that the Clays did not acquire Tobago with a definite intent not to return to Trailwood.[80] That the Clays allowed their tax exemption on Trailwood to lapse may be evidence of intent not to return but it is not dispositive,[81] especially

---

[78] *Beck v. Avindino*, 29 Tex. Civ. App. 500, 68 S.W. 827, 829 (Tex. Civ. App.—Dallas 1902, no writ) (stating that renting of homestead may be enough to show abandonment if renting is not temporary).

[79] *See Paddock v. Siemoneit*, 147 Tex. 571, 218 S.W.2d 428, 436 (1949) (stating that wife could lose homestead protection in land only by abandonment or voluntary conveyance).

[80] *Wharton v. Mortgage Bond Co. of N.Y.*, 48 S.W.2d 519, 522 (Tex. Civ. App. —Fort Worth 1931, no writ) (stating that to establish abandonment, "[i]t must appear that the removal was with a definite purpose and intent to never return"); *see also West Tex. State Bank of Snyder v. Helms*, 326 S.W.2d 47, 49 (Tex. Civ. App.—Eastland 1959, no writ) (stating that abandonment requires showing of "present, definite, and permanent intent to cease to use the property").

[81] *See Ramsey v. Davis*, 261 S.W.3d 811, 817 n.1 (Tex. App.—Dallas

30

considering that a tax exemption for a person's homestead is generally only available if the property is the person's principal residence.[82] Thus, if the Clays' principal residence was Tobago, but they lacked an intent not to return to Trailwood, the Clays could lose their homestead tax exemption for Trailwood without losing constitutional homestead protection from creditors.[83]

With respect to the deed of trust on Trailwood, Richard testified that he executed the deed of trust because the bank asked them to and that the bank had been informed that Diane was buying Tobago with funds from her inheritance. The bank president testified that it was normal bank practice when a party is abandoning one homestead and acquiring another with a bank loan, which he understood was Diane's intention, and the former homestead had not yet been sold. Thus, there was apparently some confusion at the bank as to whether Trailwood would be sold, and this court does not have to conclude either that the Clays evidenced a desire to abandon their homestead at

2008, pet. denied) (noting that county records relating to homestead exemption are not determinative of homestead status).

[82] *See* Tex. Tax Code Ann. § 11.13(a), (j), (*l*) (Vernon 2008).

[83] *See Dodd v. Harper*, 670 S.W.2d 646, 649 (Tex. App.—Houston [1st Dist.] 1983, no writ) (stating that "[t]o assert that [constitutional homestead protection] could be voided by a mere failure to designate the property as a homestead for tax purposes would be to render the constitutional homestead protection meaningless").

Trailwood by signing the deed of trust or that they induced the bank to give them a loan by executing a void security instrument.[84]

In light of the record before us, because Appellants failed to produce legally sufficient evidence that the Clays had abandoned their homestead at Trailwood with an intention not to return to it, the trial court did not err by failing to find abandonment.[85] We overrule Appellant's fourth issue.

*Characterization of Tobago*

In Appellants' fifth issue, they argue that the evidence was legally insufficient to support the trial court's finding that Tobago is the separate property or, alternatively, the sole management community property of Richard's wife Diane. In Appellants' prayer for relief on appeal, they ask this court to determine that each of the other properties purchased by Richard and Diane are also subject to execution to satisfy the underlying judgments against Richard. At trial, Richard testified that the president of the bank that financed the purchase of Tobago had told Diane that "she could have all the real estate she wanted if she would pay 10 percent down" and that consequently, Richard and Diane had executed notes and deeds of trust to finance the purchase of

---

[84] *See Hinton*, 77 S.W.2d at 736.

[85] *See Dow Chem.*, 46 S.W.3d at 241.

32

five additional properties.  Because the trial court's judgments made no findings as to these other properties, we will not address them.

Property acquired during marriage is presumed to be community property.[86]  This presumption may be rebutted, however, by clear and convincing evidence.[87]  Appellants challenge the legal sufficiency of the trial court's finding that Richard rebutted this presumption as to Tobago.

Because the burden of proof at trial was clear and convincing evidence, on appeal we apply a higher standard of legal sufficiency review than is ordinarily employed in civil cases.[88]  In reviewing the evidence for legal sufficiency under the clear and convincing standard, we must determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that its finding was true.[89] We must review all the evidence in the light most favorable to the finding.[90]  This means that we must assume that the factfinder resolved any disputed facts in favor of its finding if a

---

[86] Tex. Fam. Code Ann. § 3.003(a) (Vernon 2006).

[87] *Id.* § 3.003(b).

[88] *In re J.F.C.*, 96 S.W.3d 256, 265–66 (Tex. 2002).

[89] *Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue*, 271 S.W.3d 238, 248 (Tex. 2008); *Diamond Shamrock Ref. Co. v. Hall*, 168 S.W.3d 164, 170 (Tex. 2005).

[90] *Hogue*, 271 S.W.3d at 248; *Hall*, 168 S.W.3d at 170.

33

reasonable factfinder could have done so.[91]   We must also disregard all evidence that a reasonable factfinder could have disbelieved.[92]   We must consider, however, undisputed evidence even if it is contrary to the finding.[93] That is, we must consider evidence favorable to the finding if a reasonable factfinder could and disregard evidence contrary to the finding unless a reasonable factfinder could not.[94]

Property purchased during marriage on the credit of the community is community property unless there is an express agreement from the lender to look only to the separate property of the purchasing spouse for satisfaction of

---

[91] *Hogue*, 271 S.W.3d at 248; *Hall*, 168 S.W.3d at 170.

[92] *Hogue*, 271 S.W.3d at 248; *Hall*, 168 S.W.3d at 170.

[93] *City of Keller v. Wilson*, 168 S.W.3d 802, 817 (Tex. 2005); *Hall*, 168 S.W.3d at 170.

[94] *Adams v. YMCA of San Antonio*, 265 S.W.3d 915, 917 (Tex. 2008); *City of Keller*, 168 S.W.3d at 827.

the debt.[95]  The intention of the spouses is not controlling in the absence of such an agreement.[96]

Although Diane had inherited several hundred thousand dollars from her mother, she did not use these funds to purchase Tobago.  Instead, Richard approached a bank about financing the purchase through a loan.  It was undisputed that both Richard and Diane signed the note by which they acquired the funds used to purchase Tobago.[97]  Although Richard testified that he assumed that he was just a "co-maker," that is, that he would only be obligated on the loan if Diane did not pay, the note itself was not introduced into evidence.  The deed of trust on Tobago stated that the maker of the note was

---

[95] *Glover v. Henry*, 749 S.W.2d 502, 503 (Tex. App.—Eastland 1988, no writ); *Holloway v. Holloway*, 671 S.W.2d 51, 57 (Tex. App.—Dallas 1983, writ dism'd); *Goodloe v. Williams*, 302 S.W.2d 235, 237–38 (Tex. Civ. App.—Texarkana 1957, writ ref'd); *see also Broussard v. Tian*, 156 Tex. 371, 295 S.W.2d 405, 406–07 (Tex. 1956) (noting that vendor's lien note executed by husband during marriage, when nothing in note or related instruments were to the contrary, was by presumption a community obligation, and in absence of showing otherwise, the community thereby acquired ownership in the property and holding that evidence not sufficient to support jury finding of an agreement between grantor and husband to make the note a separate obligation of husband and the property therefore his separate estate), *cert. denied*, 353 U.S. 941 (1957).

[96] *Glover*, 749 S.W.2d at 503; *Holloway*, 671 S.W.2d at 57.

[97] *UBS Fin. Servs., Inc. v. Branton*, 241 S.W.3d 179, 189 (Tex. App.—Fort Worth 2007, no pet.) ("By signing a contract, a party is presumed to have read and understood its contents.").

"Diane T. Clay and husband, Richard R. Clay." Thus, Tobago was acquired on community credit.

The bank took as security an assignment of a certificate of deposit at the bank that was in Diane's name, but it also took a security interest in Tobago, the deed for which listed both Richard and Diane as grantees. Although the bank president testified that the Clays had requested the loan be made to Diane and that he understood that Diane wished to acquire the property as her separate property, the deed as executed listed both Richard and Diane, and both Richard and Diane signed the note. Although the bank president testified that the Clays had requested the loan to be in Diane's name alone, "which was fine considering that she was putting up the additional collateral" of the certificate of deposit, under the loan documents as actually executed—and not corrected or amended by the time of trial—there was not clear and convincing evidence that the bank expressly agreed to look *solely* to Diane's separate property to satisfy the loan. And in March 2001, at the bank's request, Diane and Richard executed a deed of trust on Trailwood to secure the note, and Richard testified that they did so at the bank's request, which belies an agreement that the bank had expressly agreed to limit itself to Diane's separate property for satisfaction of the debt. Thus, because a factfinder could not reasonably form a firm belief or conviction that the bank expressly agreed to

36

look solely to Diane's separate property, the evidence was not legally sufficient to support the trial court's finding that Tobago is Diane's separate property.[98]

Appellants further argue that the evidence was not legally sufficient to support the trial court's alternative finding that Tobago was Diane's sole management community property. Community property is generally subject to the joint management of the spouses unless they provide otherwise by agreement.[99] But community property is not subject to joint management if one spouse has sole management, control, and disposition of the property.[100] A spouse has sole management, control, and disposition over property that the spouse would have owned if single.[101] Property is presumed to be one spouse's

---

[98] *See Hogue*, 271 S.W.3d at 248; *Hall*, 168 S.W.3d at 170; *Broussard*, 295 S.W.2d at 407 (stating that although bank considered existence of husband's separate property in making loan, that did not reflect a contract that it was to be paid out of those properties or out of husband's separate property generally); *see also Brooks v. Sherry Lane Nat'l Bank*, 788 S.W.2d 874, 877 (Tex. App.—Dallas 1990, no writ) (holding that when wife paid for property with inheritance from her mother, property was in both spouses' names but considered by couple to be wife's property, property was then sold and proceeds placed in wife's savings account, her husband considered account to be wife's separate property though he was a signatory, and couple made an informal oral agreement before opening account that account would belong to wife, this evidence did not rebut presumption that property was community property).

[99] Tex. Fam. Code Ann § 3.102(c).

[100] *Id.* § 3.102(a).

[101] *Id.*

37

sole management community property if it is held in that spouse's name alone "as shown by muniment, contract, deposit of funds, or other evidence of ownership."[102] If property is the sole management community property of one spouse, it is not subject to the nontortious liability of the other spouse.[103]

When property is transferred, title to the property vests upon execution and delivery of the deed.[104] In this case, although both Richard and Diane testified that Diane owned Tobago, the deed actually named both Richard and Diane as grantees. Thus, title to the property vested in them both.[105] The evidence was also undisputed that both Clays signed the note and the deed of

---

[102] *Id.* § 3.104(a). *But see Evans v. Muller*, 510 S.W.2d 651, 655 (Tex. Civ. App.—Austin 1974) (stating that predecessor statute "by its terms, seems to operate not for the benefit of the spouse, but instead for the protection of those third persons who may deal with the spouse in possession or in whose name the property is held"), *rev'd on other grounds*, 516 S.W.2d 923 (Tex. 1974); *Cockerham v. Cockerham*, 514 S.W.2d 150, 160 (Tex. Civ. App.—Waco 1974) (Hall, J. dissenting) (stating that statute did not convert joint management community property to sole management community property and thereby exempt it from liability and that presumption provided by statute was intended to protect third persons), *rev'd in part and aff'd in part*, 527 S.W.2d 162 (Tex. 1975).

[103] Tex. Fam. Code Ann. § 3.202(b)(2).

[104] *Stephens County Museum, Inc. v. Swenson*, 517 S.W.2d 257, 261 (Tex. 1975).

[105] *See In re Marriage of Murray*, 15 S.W.3d 202, 205 (Tex. App.—Texarkana 2000, no pet) (stating that when deed names more than one grantee without stating interest of each grantee, presumption arises that each grantee is vested with title to equal undivided interest).

38

trust relating to the transaction.  That both Clays were listed as grantees on the deeds and both Clays signed the deed of trust and the note is sufficient to establish that Tobago when acquired was subject to the Clays' joint management.[106]

Richard argued to the trial court that no person can be made a grantee without his acceptance of the deed and that he did not accept delivery.  Richard is correct that a grantee must accept the deed in order for the deed to convey an interest in the property to him.[107]  But the recording of a deed creates a rebuttable presumption that the grantee accepted the deed.[108]  The deed from the grantors to Richard and Diane was recorded, which created a presumption that Richard accepted the deed.  There is no evidence in the record that after the Clays acquired Tobago, Richard said anything or took any action prior to filing suit that was inconsistent with an ownership interest in Tobago.  Although Richard and Diane testified that it had not been their intention in

---

[106] *See Cockerham v. Cockerham*, 527 S.W.2d 162, 170 (Tex. 1975) (holding joint management of property sufficiently established by fact that title to property was taken in both spouses' names and both spouses were obligated on note under which money to buy property was acquired); *Cooper v. Tex. Gulf Indus., Inc.*, 513 S.W.2d 200, 201–02 (Tex. 1974) (same).

[107] *See Panhandle Baptist Found., Inc. v. Clodfelter*, 54 S.W.3d 66, 71 (Tex. App.—Amarillo 2001, no pet.).

[108] *Tex. Land & Mortgage Co. v. Cohen*, 138 Tex. 464, 159 S.W.2d 859, 863 (1942); *Clodfelter*, 54 S.W.3d at 71–72.

setting up the transaction for Richard to have an ownership interest in the property, that is not evidence that he did not actually accept the deed. Thus, Richard did not rebut the presumption of acceptance. The trial court therefore should have presumed that Richard accepted the deed and that the deed therefore vested an interest in the property in Richard. The property was therefore joint management community property absent evidence from Richard to the contrary. Furthermore, once title vested in Richard, a subsequent deed from the same grantors to Diane could not thereby divest Richard of his title to the property.[109] Assuming that a spouse may rely on section 3.104 to protect property from the other spouse's creditors,[110] Richard is not entitled to the presumption in this case. Thus, unless the evidence established that Richard and Diane agreed that Tobago would be under Diane's sole management, then Tobago was subject to their joint management.[111]

---

[109] *Nat'l Bank of Commerce v. May*, 583 S.W.2d 685, 689–90 (Tex. Civ. App.—Eastland 1979, writ ref'd n.r.e.) (noting that after execution and delivery of deed, neither grantor nor grantee may alter or destroy deed and thereby divest grantee of title to land as originally described); *see also Henson v. Peterson*, 218 S.W. 126, 128 (Tex. Civ. App.—Texarkana 1919, writ ref'd) (holding that after grantor conveyed life estate to grantee with remainder to grantee's children, grantor and grantee could not subsequently by agreement enlarge grantee's estate and divest remaindermen of interest acquired under deed).

[110] *But see Evans*, 510 S.W.2d at 655.

[111] Tex. Fam. Code Ann. § 3.102(c).

We therefore look to the record to determine if the Clays produced more than a scintilla of evidence that they entered into an agreement that the property would nevertheless be Diane's sole management community property.[112] Although there was testimony that the parties had originally planned that Diane would acquire Tobago as her separate property, there was no testimony or other evidence admitted to show that Diane and Richard had entered into an agreement that the property, once acquired as community property, would be under Diane's sole management.[113] Furthermore, any circumstantial evidence that could support such an agreement was no more than a scintilla. Richard testified that the note from the bank was for a bridge loan that became due at the end of one year, that the note was paid off, and that "at the end of the year they went to a balloon note," but he does not state who "they" is, and thus it was not clear that Diane is the only one obligated on the new note. Diane testified that Richard pays some of their bills, but she

---

[112] *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998) (setting out standard of review for challenges to legal sufficiency of evidence), *cert. denied*, 526 U.S. 1040 (1999); Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 Tex. L. Rev. 361, 362–63 (1960).

[113] *See Brooks*, 788 S.W.2d at 877 (stating that although couple may have intended, prior to opening of accounts, for wife to own accounts as her special community property, the intent was superseded by opening of joint account with its joint right of control).

41

could not recall which ones, and there was no testimony that Richard does not pay for any of the household bills relating to Tobago. Rather than having no involvement with Tobago, both Richard and Diane live at Tobago with their children, and there was no evidence that Richard did not participate in decision-making with respect to Tobago.[114] No action was taken to put the property in Diane's name alone until after the Clays commenced this litigation. And in fact, in March 2001, Richard and Diane executed a new deed of trust on Trailwood to secure the note on Tobago. Richard testified that when he was served with the writs of execution and he was asked by the constable which house he wanted to sell, he told the person serving him, "pick you one," that his homestead was Trailwood, "but, you know, sell whichever one you want." He did not tell the officer that Tobago was not his property or was not subject to execution for his debts. That the grantors executed another deed to Tobago in Diane's name alone after Richard filed suit is evidence Diane attempted to convert the property into her separate property, but it is not evidence of an

---

[114] *See Patel v. Kuciemba*, 82 S.W.3d 589, 596 (Tex. App.—Corpus Christi 2002, pet. denied) (holding that stores were husband's sole management community property when wife worked at two stores but did not discuss or even know of decisions husband made on investments, borrowing money, or running business and she never participated in making loans for money to run stores where she worked).

agreement that the property would be community property subject to Diane's sole management.[115]

Because Richard did not produce more than a scintilla of evidence that he and Diane entered into an agreement that Tobago would be under Diane's sole management, the evidence was legally insufficient to support the trial court's finding. Because the trial court erred by finding that Tobago was Diane's separate property or sole management community property, it also erred by declaring that Tobago is not subject to execution for payment of Richard's debts. We sustain Appellants' fifth issue.

## Conclusion

We affirm the trial court's judgments in part and reverse the trial court's judgments in part. Having overruled Appellants' fourth issue, we affirm those portions of the trial court's judgments declaring that Trailwood is Richard's homestead. Having sustained Appellants' first, second, third, and fifth issues, we reverse the remaining portions of the trial court's judgments, vacate those portions of the trial court's judgments permanently enjoining the enforcement of the underlying money judgments, and render take-nothing judgments against

---

[115] *Cf. Montemayor v. Ortiz*, 208 S.W.3d 627, 645 (Tex. App.—Corpus Christi 2006, pet denied) (holding that store was wife's special community property when "unequivocal evidence" indicated that wife maintained full control over management and operations of store, no community capital assets were used to increase business, store was purchased with wife's separate property, no debts were incurred by both husband and wife to finance growth of store, and store did not rely upon any community-owned real property).

Richard on all of his claims for declaratory relief except his claim that Trailwood

is his homestead.

LEE ANN DAUPHINOT
JUSTICE

PANEL:  CAYCE, C.J.; DAUPHINOT and MCCOY, JJ.

DELIVERED: April 23, 2009

44